Wendy Tuomela Pro se

P.O. Box 1232

Kihei, Hawaii  96753

Wendytuomela@gmail.com

(808) 281-2348

Electronically Filed
SECOND CIRCUIT
2CCV-20-0000054
27-FEB-2020
10:44 AM

IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

STATE OF HAWAII

Wendy Tuomela                                Civil No._____

                Plaintiff

        vs.

Waldorf-Astoria Grand Wailea Hotel          Complaint;  Demand for Damages;

% CSC Services of Hawaii, Inc.              Attachments  A-T;  Summons;

   1600 Pauahi Tower, 1003 Bishop Street

   Honolulu, Hawaii, U.S.A.  96813

        Does  1-78

            Defendants

## COMPLAINT

Plaintiff; Wendy Tuomela, resident of Maui County since 2/14/1994, comes before this court with the prayer for damages and restitution for the injuries inflicted upon her by these defendants.

On September 19th, 1998, Ms. Tuomela began her employment with the Grand Wailea Hotel. Her employment record was exemplary, she was a role model for her co-workers. She advanced to full server at the Humuhumunukunukuapua'a Restaurant in 2002. Her career continued, and she became a trainer for new associates at the restaurant. Even though the management changed almost each and every year of her career, she stayed on and impressed them all with her professionalism and excellent customer service talents. Her evaluations were always exceptional. During her entire tenure there was never a negative write up. The agents of the hotel who terminated her, did not know her. Her first introduction to them, was when she was threatened with incarceration, accused of theft and misconduct, then put on suspension for crimes and acts she did not commit. In the pursuit of justice, she is seeking accountability from the corporation.

In addition to building her career in the hotel food and beverage business she was also building a great reputation for the hotel. Ms. Tuomela always served her clients with pride and respect and represented the hotel with that same respect and pride. At the time of her termination, the agents of the hotel did not follow proper Protocol nor the Chain of Command. None of her supervisors were involved with her termination, she was fired by a security guard and a human resources representative. Her own union representative assisted the hotel agents in her termination gaining the benefit of his own unjust enrichment by breaching his fiduciary duties. (H.R.S. Div.1 Govt. 96-15)

**Count 1: Extortion:** Elements of Extortion; Extortion is the obtaining of property from another, with his/her consent, induced by the wrongful use of actual or threatened force, violence, fear, or under color of official right. The Use of a threat in order to obtain money or anything of value constitutes the crime of extortion. Intent is also regarded as an element for extortion. Extortion is a specific intent crime. (H.R.S.Div. 4. 663-2 & H.R.S 707-764)

On April 13th, 2018, Mike Palazzotto, and Carol Kawabata, verbally threatened Ms. Tuomela with incarceration. On April 17th, 2018, Ms. Tuomela gave Mr. Palazzotto 2-$100.00 bills. Then threatened her again with incarceration if she did not pay an additional $900.00 in cash. The threat was real and present and created fear in Ms. Tuomela. Mr. Palazzotto had a Maui Police Officer and squad car posted outside the office with handcuffs waiting to arrest her if she didn't comply with his demands. She went upstairs in the hotel and got the cash then delivered it to Ms. Kawabata and Mr. Palazzotto. After giving them the cash she was released without being arrested. The cash was literally a ransom. (Ransom: a sum of money or other payment demanded or paid for the release to freedom of a person held, not at will)

**Count 2: Breach of Fiduciary Duty:** Elements of Fiduciary Duty; [a]the defendant was acting as a fiduciary of the plaintiff. [b] the defendant breached a fiduciary duty to the plaintiff. [c] the plaintiff suffered damages as a result of the breach. [d] the defendant's breach of fiduciary duty caused the plaintiff's damages.(LMRDA of 1959 Title V Section 501)(U.S.C. 185 &501)

On April 13th, 2018, Carol Kawabata, human resource representative, had a duty to Ms. Tuomela to defend her against the verbal abuse and threats that she was receiving from Mr. Palazzotto, Ms. Kawabata did nothing to make him stop his abuse and threats. In addition, on April 17th, 2018, Mr Stephen West of the ILWU union was sent to represent Ms. Tuomela and instead of defending her and following up with a grievance to the false charges that were being made, he completely failed in his duty to represent her.(Exhibit K) & (Exhibit T)

**Count 3: Defamation of Character:** Elements of Defamation of Character: Any false statement that injures someone's reputation and exposes her to public contempt, hatred, ridicule and condemnation. (Restatement (Second) of Torts 558) &(Dunlea v.Dappen, 83 Hawai'i 28, 924 P.2d 196 (1996)

On April 17th, 2018, Ms. Carol Kawabata told Mr. Justin Sugarman that Ms. Wendy Tuomela was fired for theft and misconduct.  Ms. Tuomela was terminated from her 20 year career employed as a restaurant server at the Grand Wailea Hotel.  Subsequent to Mr. Sugarman hearing this confidential information, he then told other staff members of the Humu Room Restaurant that Ms. Tuomela was fired for theft and misconduct. (Exhibits A-H)  In an effort to find other employment, Ms. Tuomela applied for similar positions to the job she had lost.  Each and every time, she was denied employment.  Denials came from the Hotel Wailea, Four Seasons, Andaz, Marriott Wailea Beach Resort and the Fairmont Kealani.  These hotels are similar in their business and clientele to the Grand Wailea Resort.  Ms. Tuomela was essentially blackballed from any employment in Wailea, while positions she applied for and is highly qualified for remain open and vacant.

On August 3rd, 2018, in a continuing search for comparable employment, Ms. Tuomela was confronted with a police report (public record) (Exhibit I) that states her age as 57 (discriminatory) and she is accused of theft.  The false police report surfaced when she was applying for a job which required a background check.  Due to the defamatory nature of the police report she did not get the position she was seeking.  Further, many friends, family members, return hotel guests, and clients, and other members of the community, when going to dine at the Humu Room and requesting Ms. Tuomela's service, were told that she was fired for theft and misconduct. (Exhibits A-H)  This ruined her previously spotless reputation.  She has not been able to gain employment equal to the position that she lost as a server at the Humu Room in the Grand Wailea Hotel.  This defamation is a civil wrong (tort) which entitles Ms. Tuomela to monetary compensation.  She should recover damages in the amount of lost wages and benefits, past and future.  Due to the inflammatory nature of this case, her injuries, with the depraved indifference and the heinous disregard for her reputation, these damages are sought in treble.

**Count 4: Wrongful Termination:**  Elements of Wrongful Dismissal [a] Violates laws against discrimination (age). [b] Not aligning with written and spoken employment agreements (ILWU contract) [c] Violation of specific Labor Laws (Department of Labor and Industrial Relations Administrative Rules: Title 12, Chapter 24) [d] Results in an employee complaint adjacent to the employer. 1](Verbal abuse and threats from a co-worker) 2](whistel-blower concerning Infestation of Black Mold) 3] (Extortion of Cash and termination without following chain of command or protocol) (H.R.S. 378-62)(42 U.S.C.2000e-3(a))

On April 13th, 2018, Ms. Tuomela's locker was illegally searched and the contents were removed.  Her 4th Amendment rights were violated.  There was no probable cause, no warrant, and no documentation of the items removed from her locker.  At the time of the unwarranted search, there was no law enforcement officer present, nor was Ms. Tuomela present.  The removal of her personal items can be called breaking, entering and theft.  Many of her personal belongings were never returned to her, including a mesh bag of valuable(irreplaceable) earrings and her personal cash bank, which contained U.S. currency and unused prepaid cash cards.

Upon Ms. Tuomela's arrival to work on April 13th, 2018, she was sequestered in a small back office with the door closed and detained by Ms. Kawabata and Mr. Palazzotto two people she was not acquainted with.  Mr. Palazzotto verbally threatened Ms. Tuomela with incarceration.  Mr. Palazzotto's words to her: "I know where you live, and I will send the police to your house to arrest you, if you don't come clean with me right now!"  He then proceeded to shove a Visa credit card in Ms. Tuomela's face and shouted "What did you do?"  Ms. Tuomela had no idea what he was yelling about, and told him so.  Ms. Kawabata, Human Resource representative, just sat there and allowed the abuse to continue.  Ms. Kawabata had a duty to Ms. Tuomela to defend her against the verbal abuse she was receiving from Mr. Palazzotto, a fellow associate crossing the lines of abuse.  He had no right to verbally assault Ms. Tuomela.  Ms. Tuomela asked for a union representative and a steward was located by phone.  The union shop steward informed Ms. Tuomela that she had the right to remain silent and the union would contact her.  Ms. Tuomela was put on suspension pending investigation, and escorted off of the hotel property in front of all of her co-workers embarrassing her irreparably.

On April 16th, 2018, Ms. Tuomela was summoned for a meeting. Stephen West (ILWU) was there to represent her from her union. Mr. West went behind closed doors with Ms. Kawabata and Mr. Palazzotto. When Mr. West emerged, he informed Ms. Tuomela the reason for her suspension was a "sting game" with a secret shopper. Ms. Tuomela was told that she did not turn in the $200.00 cash that was given to the guest. Ms. Tuomela explained to them that she had used a prepaid cash card in exchange for the currency, for the same value as the cash. Her bottom line balanced that evening, as it had each and every shift she worked for the last 20 years, there was no theft. Mr. Palazzotto again accused her of using the same Visa credit card (name on visa card is Adam Maginot) (Exhibit O) that Mr. Palazzotto supposedly found in her locker during the illegal search, he told her she was guilty of identity theft. Ms. Tuomela adamantly denied those allegations as she had never seen that credit card prior to Mr. Palazzotto putting it in her face on April 13th, 2018.

On April 17th, 2018, there was a third meeting with Ms. Kawabata, Mr. Palazzotto, Mr. West and Ms. Tuomela. In that meeting, Mr. Palazzotto informed Ms. Tuomela that there was a Maui Police officer outside and he was there to take her to jail. In fear with extreme anxiety and under duress Ms. Tuomela asked Mr. West what she should do, she was scared and she did not want to go to jail. Immediately Ms. Tuomela gave Mr. Palazzotto 2-$100 dollar bills and told Mr. West that she had another prepaid cash card for $1000.00 with her that the credit card company had issued to her. Mr. West went behind closed doors again with Ms. Kawabata and Mr. Palazzotto without Ms. Tuomela. Mr. West came out and told Ms. Tuomela that the only way she would avoid going to jail right now, would be to pay $900.00 more in cash, to Ms. Kawabata and Mr. Palazzotto and the prepaid cash card would not be acceptable. They had already taken her personal bank from her locker, with approx. $300.00 remaining on the pre-paid card in her bank.

Mr. West convinced Ms. Tuomela that she should pay the $900.00 in cash, and asked her if she could go and get them the cash right now. Ms. Tuomela would have done whatever they asked because she believed they would send her to jail, seeing the police officer was waiting outside with his squad car and handcuffs. Ms. Tuomela went to the cash machine in the hotel and used her 3 personal credit cards and got the cash. She complied with the demand and paid the cash ransom to Ms. Kawabata. (Exhibit J) A third time Mr. Palazzotto accused Ms. Tuomela of identity theft and put the same Visa credit card in front of her, and again she denied the accusation adamantly. Ms. Kawabata informed Ms. Tuomela that she was terminated from her 20 year employment at the Grand Wailea Hotel. At that time Ms. Kawabata verbally stated that the circumstances of the termination would be kept confidential.

Mr. West assured her that she had done the right thing, she should be happy that she was not going to jail. Ms. Tuomela believed that the $900.00 cash payment was quid pro quo to secure her employment at the hotel because she knew that she had done nothing wrong. Furthermore, Mr. West did not do his due diligence and grieve Ms. Tuomela's case. The union then abandoned her and would not help her any further. At present, Mr. West is gainfully employed by the Grand Wailea Hotel in a position similar to the one that Ms. Tuomela held and was terminated from.

Had a proper investigation been conducted by Ms. Kawabata and Mr. Palazzotto, Ms. Tuomela's innocence would have been revealed. When the police report surfaced, Ms. Kawabata was asked about it and she stated that there was "No Theft." In fact, there was no theft or misconduct, ever. Ms. Tuomela is innocent of all charges. These agents of the hotel were virtually playing "games" with Ms. Tuomela's livelihood. The question about what happened to the cash has never been answered? Who received that money?. Proper Protocol was never followed and the Chain of Command was ignored. (Exhibits Q-R)

There were never any cash handling violations committed by Ms. Tuomela  (Exhibit S)

During Ms. Tuomela's 20 year tenure at the Grand Wailea Hotel, she had perfect attendance. She was never written up for anything, zero write-ups. (Exhibit P)  After her termination she was not offered an Exit Interview.

She was never compensated for her 295 unused sick hours that she had accumulated over the years. (Approximate value at minimum wage $3,000.00 USD)

Throughout her career, Ms. Tuomela won high sales incentive awards, one of which was a prepaid cash card from the hotel for $500.00. She was a team leader, and trained many of the new associates. She worked 6 shifts a week, most weeks. (Ref: to Labor Law) She started and was head server for the Sunday Brunch at the Humu Room from October 2017 until April 2018. After her termination the Sunday Brunch at the Humu was discontinued. As a team leader, up to 9 servers had access to her personal Micros card. The company never issued a team card. Any one of those servers could have used her swipe card in an unsavory way that would put her in jeopardy, but she trusted her co-workers. By not conducting a thorough investigation, Ms. Tuomela's reputation was destroyed and she suffers from immense personal loss and severe financial hardship.

**Count 5: Breach of Contract:** Elements of a Contract:  A contract is an agreement between two parties that creates an obligation to do or refrain from doing a particular thing.  Action for Breach of Contract arises when the performance of any person does not live up to the terms of the contract and causes the other party to suffer economic damages or other types of visible injury. (LMRDA Title V Section 501(b)) (29 U.S.C. 185 & 501)

On April 17th, 2018, Ms. Carol Kawabata entered into a contract with Ms. Wendy Tuomela.  The Offer was made by Ms. Kawabata to keep the circumstances of Ms. Tuomela's termination confidential.  Ms. Tuomela agreed, accepted these terms, therefore the contract was formed. Witnesses to the formation of this contract were Stephen West (ILWU) and Michael Palazzotto hotel security.  "Consideration" was made to refrain from disclosure.  Almost immediately Ms. Kawabata breached this contract by disclosing the circumstances of the termination to Mr. Justin Sugarman, Humu outlet manager.  Mr. Sugarman, on April 19th, 2018, then told the staff members of the outlet that Ms. Tuomela was terminated for theft and misconduct. (Exhibits A-H) the false accusations and false information then spread like wildfire throughout the hotel and the community defaming Ms. Tuomela.  And the repercussions continue.

A natural person who enters into a contract possesses complete legal capacity to be held liable for the duties she or he agrees to undertake.  All parties understood the nature and consequences of the agreement that was entered into.  When Ms. Kawabata disclosed the confidential information to Mr. Sugarman, she was in violation of her duty to "not disclose."  Therefore, Ms. Kawabata breached the contract that was formed on April 17th, 2018.  Ms. Tuomela contacted the Hilton Code of Conduct Hotline and Ms. Kawabata, the hotel director(Alan Federer) and Mr. West all continued their deception by telling the Hilton corporate Hotline that Ms. Tuomela was guilty of theft and misconduct. (Exhibit K)

Where a contract is breached in a wanton or reckless manner [so] as to result in tortious injury, the aggrieved person is entitled to recover damages.  The dispositive factor is rather, the wanton and reckless nature of Ms. Kawabata's breach.  As a representative of the hotel the egregious manner in which this sensitive information was regarded, is heinous, the damage that was caused to Ms. Tuomela and her reputation due to this disregard, is enormous and irreparable.

Presumption of innocence is the legal right of all citizens. Innocent unless proven guilty. Using the legal principle that one is considered innocent unless or until proven guilty beyond a reasonable doubt. It was traditionally expressed by the Latin maxim ie incumbit probatio qui dicit, non qui negat (the burden of proof is on the one who declares, not on one who denies) One must be proven guilty "Beyond a reasonable doubt, without any burden on the accused to prove her innocence." Presumption of innocence is a legal right of the accused and it is an international human right under the United Nations Universal Declaration of Human Rights, Article 11.

Due process is the legal right and requirement owed to any person. Due process balances the power of the law of the land and protects the individual from it, specifically, protecting the right of the individual citizen to pursue life, liberty and property.

In this case Ms. Tuomela was presumed guilty, by the agents of the company, and the burden has been put upon her to prove her innocence. She was never given the benefit of the doubt by her employer. When her innocence was finally revealed, nothing was done to rectify the situation she endured. Her life has been turned upside-down, her livelihood was taken from her which has created severe financial hardship. Not only was her financial well-being threatened but also her freedom, mental wellness and position in the community. The representatives of the hotel accused her of things she did not do, acted as judge, jury and terminated her. This is all happening at a time in Ms. Tuomela's life when she should be looking forward to retiring gracefully, and living out her life in peace. The request is to be made whole once again, so that she can resume the life she formerly knew and had spent 20 years building for her and her family.

**Damages: Prayer for Relief and Restitution:**

**Compensatory Special Damages:** Lost wages and benefits from 2018 to 2028 past and future earnings up to retirement age of 67, $100,000.00 annually for lost wages $25,000.00 annually for lost benefits. (Exhibits L-N)

Pray for lost monetary reimbursement of, $1,250,000.00 in U.S. Currency.

**Statutory Damages:** Return of the Cash (USD) that was extorted on April 17th, 2018

(Exhibit J)  Return of the value of personal items taken from unwarranted locker search in U.S.Currency.

**Punitive Damages:** Loss of Good Reputation: Priceless; seeking monetary damages in trebel.

Seeking prayer for Restitution: Expunge all of Ms.Tuomela's records, and exoneration from all false accusations.  She is also asking for a public apology.

To be reinstated to a position equal to the position she lost with full seniority and full benefits for her and her family.  The friends and family benefits that she earned for life, for completing over ten years of service.  Cash in the amount of her unused sick pay.  The request is to be made whole once again.

Asking for reimbursement for all court costs and legal fees

May 3, 2019


Tracy Glen McGuire
282 Hale Kai St.
Kihei Hi. 96753


To whom it may concern,

I first met Wendy Tuomela when I was hired as her manager at the Grand Wailea Resort in December of 2006. While I had been in the food and beverage industry for 28 years prior, I had never been a food and beverage manager in such a huge resort. I immediately looked for those team members who had shone maturity and experience, and were able to help me to connect to the rest of the team. Wendy was such a team member. We immediately connected as I got to know her and learn of her own management experience on the mainland. Wendy was eager to help me assimilate into the role of food and beverage manager by teaching me operational aspects such as POS , menu knowledge, server check out procedures, as well as many other functions within the Humuhumunukunukuapua restaurant operations.

Wendy was always a consummate professional in her dealings with guests, interaction with fellow team members, and check handling procedures. Wendy garnered many favorable comments from guests and was one of the most requested servers on the team.

When I learned of Wendy's dismissal I was shocked. Naturally you wonder what happened? I played out all possible scenarios in my head and I couldn't find one legitimate reason why her employment would be terminated so suddenly. As the next few days came along many rumors started to flow throughout the staff.  Fellow team members who I thought as her friends began to talk bad about her. The whole staff began to put out wild stories from having a physical altercation with a manager to destroying hotel property and to stealing none of which seem plausible given Wendy's outstanding tenure.

Now as time has past Wendy's reputation has been tarnished. We the team members at Humu Humu are a tight knit bunch. We have yearly Christmas parties, and other team gatherings throughout the year. I miss Wendy and know in my heart she is an honest and truthful person, the type of person our community needs more of.


Sincerely

Tracy Glen McGuire

Exhibit A

To whom it may concern,                              5/1/19

Wendy Tuomela has been my coworker for almost 20 years she has
been an amazing, responsible, honest and reliable person for as long
as I've known her. She was always the one to help everyone else with
no expectation of reward or recognition. Previous managers
recognized this and made her one of our "train the trainers" to help
new hires learn the ropes. She stayed and did extra work every night .
She has been targeted and treated poorly on more than one
occasion. We originally started with a cashier and then we were told
that we had to be our own cashiers when they downsized in 1999.
But we were never issued our own banks to make change for the
guest. We were expected to bring our own money and were
responsible for making sure all of our sales were accounted for and
paid at the end of the night.  She was accused of theft by using a
grand Wailea cash reward card that she received for being a great
employee and won in a competition. The Grand Wailea reward card is
considered valid payment. The books all balanced at the end of the
shift. She was bullied into resigning and neither HR or the Union
stood up for her while she was taking this treatment. They threatened
her with prison if she didn't sign and resign. She was bullied into
signing this. She paid the check and then she paid it again without
compensation from the first payment. And then they sent a cop car to
her house to intimidate her and threatened her with jail after she had
already paid. In  April of 2018 we saw her get pulled off the floor and
into HR. We were told that she would be coming back and then Justin
Sugarman told us that she had been fired for stealing. I believe that
corporate Hilton wanted to get rid of long-term employees because
we had more vacation/benefits. And they targeted those people so
that they could have a better bottom line. It is sad and disrespectful
that after all the time served making their company great these
employees are nothing more than a number to them. Wendy is a
hard-working honest amazing employee for anyone that is lucky
enough to have her.


Sincerely Anneve Strong

Exhibit B

From : Christina Henderson
1002 S Kihei Rd. #108
Kihei, Hi 96753

To whom it may concern

I first met Wendy Tuomela in 2010 when I started working at the Grand Wailea. We worked at the "Humu" (Humuhumunukunukuapua'a) Restaurant as servers. Wendy was a trainer to new employees and her cheerful demeanor was always welcoming. She was very dedicated to her job and wouldn't hesitate to work extra shifts when asked by management.

I was not present the day that Wendy lost her job at Humu. The following day when I arrived at work and learned of her dismissal , I was in shock. She had worked for the company for so many years and with such dedication, I could not imagine what had happened. No explanation was offered to the staff for her departure.

Wendy was not only a coworker but also a friend and our friendship continues. She was and is deeply affected by losing her job. Her once bubbly, fun loving personality has been dimmed.  Although she has moved on with her life she is deeply saddened by her treatment at the Grand Wailea. She often talks about these events and has so many unanswered questions surrounding her "forced resignation". She is not the same person she was.

In closing, my hope is that Wendy can get some resolve in this matter. She deserves to be the happy person she once was.


Sincerely

Christina Henderson


Exhibit C

To whom it may concern:

I'm writing this in regards to my very good friend, whom I recently learned was forced to resign from her job at the Humu room, where she worked for almost 20 years. Never in the time that I have known her has she been anything other than the most honest, hard-working, sweetest person. I have eaten at the Humu room on numerous occasions and have sent many other people there as well. I especially have told them to request Wendy as their server.

To have been told by the hotel, that she was no longer working there because of theft and misconduct, is absurd. To think that she was anything other than one of the best employees you have ever had in your employ. If you look at her service record and speak to any of her past managers or other employees, I would guarantee not 1 person would believe these accusations. Sounds to me like you want to cheat her out of the benefits she earned and deserves, after decades of great service to you.

I truly believe, that anyone that has had the privilege to know this awesome lady would say the same things as me.

Humu room, you need to be "PONO"-to do what is right!

Shame on you Grand Wailea!!!

Julia Henson

Resident of Maui for 33 years. Always worked in the Food and Beverage industry and have been a great friend of Wendy Tuomela. Please contact me for my many questions. (808) 283-6547

Exhibit D

Casa de Flores
3146 Mahana Pl.
Kihei, HI 96753

To Whom it may concern:

# Casa de Flores

Dorothy McCoy

To Whom It may Concern/

During the past thirty years
of my friendship with Wendy
Fromula I have known her as
a person of loyalty, honesty, and
commitment to family, friends,
community such as her place.

Her twenty years of out
standing employment and
service at the Grand Wailea,
her record there of being
awarded year after year top
for being one of their top
employees for service, dependable
and integrity, clearly describes
the person herself.

The circumstances of her
termination are unjust and
displaceable.

Dorothy McCoy
May 7, 2019

3146 Mahana Place, Kihei, HI 96753
808-879-1411 • 808-283-9244
dorothymccoy@icloud.com

To whom it may concern:

I am Larry E. Thorpe, a retired teacher of "40" years.

I have known Wendy Tuomela for over twenty "20" years, both socially and in her profession. Her integrity is impeccable.

I went to the Hilton to dine at the Humuhumunukunukuapua'a Restaurant at the end of April last year (2018). I asked for Wendy to be my server, and was shocked when the hostess told me that she no longer worked there. After I was seated I asked my waiter that night (Phil) about what had happened to Wendy and he told me that she had been fired for theft and misconduct. I was dumbstruck and amazed, when I found out that Wendy was forced to resign or go to jail because of a theft allegation.

This is preposterous the Wendy I know is an honest, upstanding individual that I am happy to know.

Feel Free to Contact me anytime   #1-808-639-2857

Larry Thorpe          *Larry Thorpe*

Exhibit F

VICKIE GONZALEZ
791 JEWEL COURT
CAMARILLO, CA 93010
623-512-0401

April 5, 2019

RE: Wendy Tuomela

To whom it may concern:

I'm writing this letter regarding the wrongful termination of Wendy Tuomela. I have known Wendy for over twenty five years. Not only is Wendy my sister-in-law, she is also my trusted friend. I could never in my *wildest* imagination picture Wendy stealing anything from anybody.

I think that it's a total travesty of our legal system to "try and convict" someone for a supposed crime without some type of self-defense and legal representation. Not to mention the total character assassination and humiliation that she has had to endure since the termination of her employment by her former employer.

I only hope that someone sees fit to clear Wendy's name and character, so she can stop living under this shadow of doubt.

Sincerely,

Vickie Gonzalez

Vickie Gonzalez

Exhibit G

Stephanie Pregard
1191 Pauerere
Kli 96784

May 10, 2019

To whom it may concern:

I first met Wendy in 1995 and we became fast friends, we played tennis together and met during holidays & special events as we always worked.

She was happy to be working at humu tume and enjoyed going to work.

When I started working at who cut the cheese Wendy always stepped up to help out for any special events and covering shifts at the shop.

I know Wendy to have a strong work ethic and integrity and was quite surprised to hear of trouble at the humu as these accusations are totally out of character for her. She explained that she felt falsely accused of theft & misconduct. I offered her a job and she has been an asset to our department. She has exhibited initiative and responsibility, has an excellent attendance record, is a self starter and a hard worker & completes tasks in a timely manner and is pleasant to work with. I trust her to run the department without supervision.

The name Wendy Tuomela does not equal misconduct or thief. So basically her being falsely accused has been an attribute to myself & the company I work for.

I do hope her name & reputation hasn't been

Exhibit H

# Incident/Investigation Report

**Agency:** MPD          **Case Number:** 18-016181          **Date:** 8/2/2018 14:19:47

## Incident Information

| Date/Time Reported | Date/Time Found | Date/Time Found | Officer |
|---|---|---|---|
| 04/16/2018 15:54 | 04/16/2018 15:54 | 04/16/2018 15:54 | (14420) SITHAR, LOREN J |

| Incident Location | |
|---|---|
| 3850 Wailea Alanui Dr, Wailea, HI 96753 | |

**Location Comment:**   : @GRAND WAILEA

## Charges

| 1 | Charge Type State | Description THEFT 2 | | | | Statute 708-0831 | UCR 23H | ☐ Att ☑ Com |
|---|---|---|---|---|---|---|---|---|

| Alcohol, Drugs or Computers Used | Location Type | Premises Entered | Forced Entry | Weapons |
|---|---|---|---|---|
| ☐ Alcohol  ☐ Drugs  ☐ Computers | HOTEL/MOTEL/ETC. | | ☐ Yes ☐ No | 1. |

| Entry | Exit | Criminal Activity | 2. |
|---|---|---|---|
| | | | 3. |

| Bias Motivation | Bias Target | Bias Circumstances | Hate Group |
|---|---|---|---|
| | | | |

## Victims

| Seq # 1 | Type BUSINESS | Injuries None | | Residency Status | Ethnicity |
|---|---|---|---|---|---|

| Name(Last, First, M) GRAND WAILEA RESORT | | Race | Sex | DOB | Age |
|---|---|---|---|---|---|

| Address | | Home Phone |
|---|---|---|

| Employer Name/Address | Occupation | Business Phone |
|---|---|---|

| Victim of Crimes 1 | | Driver's License | SSN | Cellular Phone |
|---|---|---|---|---|

Exhibit I

# Incident/Investigation Report

**Agency:** MPD          **Case Number:** 18-016181          **Date:** 8/2/2018 14:19:47

## Offenders

| Seq. # | Type | Name(Last, First, M) | | | | | | SSN |
|---|---|---|---|---|---|---|---|---|
| 1 | INDIVIDUAL | TUOMELA, WENDY K. | | | | | | |

| AKA | | | Race | Sex | DOB | Age | Height | Weight |
|---|---|---|---|---|---|---|---|---|
| | | | W | F | | 57 | 5'04" | 175 lbs |

| Address | Home Phone |
|---|---|
| 30 E WAIPUILANI RD, KIHEI, HI 96753 | (808) 875-7677 |

| Employer Name/Address | Occupation | Business Phone |
|---|---|---|
| GRAND WAILEA          / WAILEA ALANUI RD. | SERVER | (808) 879-1234 |

| Scars, Marks, Tattoos or other distinguishing features | Cellular Phone |
|---|---|
| | |
| | Driver's License / |

| Physical Characteristics |
|---|
| |

**Suspect Details**

EXHIBIT I

4/17/18

To:     Wendy Tuomela

From:   Carol Kawabata, Director of HR

This is to acknowledge receipt of your reimbursement in cash of $907.00 received today.

*Carol Kawabata*
4/17/18

Exhibit J

*- Code of Conduct - HOTLINE*

**Report Details**

**Report Submission Date**
8/1/2018

**Reported Company/Branch Information**
Location Grand Wailea Resort, HI
3850 Wailea Alanui Drive
City/State/Zip: Wailea, HI, United States )

**What is your relationship to Hilton?**
Team Member

**Please identify the person(s) engaged in this behavior:**
Carol Kawabata - director of human resources
Mike Palazotto - security guard
Stephen West - union representative

**At what property is this individual employed?**
Grand Wailea Resort, HI

**Have you directly reported this concern to any member of Management or Human Resources?**
Yes

**If yes, then who and when?**
Reported to Allen Federer, general manager, on June 27, 2018 via certified letter.

**Details**
On April 13, 2018, Mike approached the caller along with Carol and took the caller to an isolated room. Mike proceeded to verbally harrass the caller and threatened him/her with incarceration. Mike said "I know where you live, I'm going to send a police officer to your house, and I'm going to have you sent to jail."

On April 14, the caller returned with Stephen and was informed that the accusation was in regards to a mystery shopper incident, in which the caller paid for the meal using a cash debit card. The caller was put on suspension pending investigation.

On April 15, the caller returned and was forced to return the cash from the incident, including his/her personal tip. The caller was then told that he/she would have to resign or be fired on the spot, and that if he/she didn't cooperate, he/she would be immediately arrested.

On April 16, an officer (name unknown) was sent to the caller's home, and was going to arrest the caller. The caller explained the situation to the officer.

On June 27, the caller sent a letter to Allen describing the situation. The caller has not received a response to date.

The caller would like these concerns to be fully investigated and action taken to resolve them.

The caller also would like to know if management is exempt from the harassment clause within the code of conduct.

**Follow-Up Notes**
There are no additional notes for this report.

**Follow-Up Questions/Comments**
**8/1/2018 8:51 PM posted by Organization**
Thank you for your report. We will forward your concerns to the appropriate person for further review/investigation. Please follow up on a regular basis, in case we have additional questions for you.
**8/2/2018 4:58 PM posted by Organization**
Thank you for reaching out to us. I have reviewed all the notes provided by the hotel regarding your case and conversations with the management representatives and union. I believe the hotel took the appropriate action regarding your employment and ultimately your resignation of employment. Your actions of theft and failure to follow our proper cash handling procedures disqualifies you from reinstatement with the hotel as you had requested in your letter to the Managing Director.

John Sommer
Regional Director of Human Resources

**Chat Transcripts**
There are no chat transcripts for this incident.

EXHIBIT K





# CO-12 Code of Conduct - December 2005

## Hilton Hotels Corporation
## Standard Practice Instructions
## **Confidential - For Internal Use Only**

**SUBJECT:** Code of Conduct

**DATE ISSUED:** December 2005

**S.P.I. CODE:** CO-12

**REFERENCES:** Replaces CO-12 issued January 1, 1993; revised 1/93; revised 8/95; revised January 1999; revised June 2002; first issued 1/92; originally issued in *Code of Conduct* Booklet (1976) and Hotel Division SOP ADM-07 9/90; Revised June 2002; Revised January 2003; Revised June 2003; Revised February 2004; Revised December 2005

**RESPONSIBILITY:** All Corporate and Regional Officers, General Managers, Department Managers

### STATEMENT OF POLICY: THE RIGHT THING TO DO

Simply stated, the affairs of Hilton Hotels Corporation will be conducted in the most ethical manner. The Company's Representatives will conduct its business affairs in full compliance with all of the applicable federal, state and local laws in the various communities in which it conducts business. All Representatives are required to conduct the Company's business affairs within both the letter and spirit of these laws. All Representatives will seek to achieve for the Company the highest degree of respect and esteem of the public in general and of those with whom the Company does business.

In all cases, Representatives are to be guided by generally recognized ethical obligations. That means they will not only avoid activities that could involve the Company in an improper practice, but also will avoid even the appearance of impropriety. As the Company's Representatives, they will practice honesty and sincerity in their dealings on its behalf.

In furtherance of its commitment to the highest standards of ethical conduct in every aspect of its business dealings, the Company sets forth the following guiding ethical principles and values which it expects and demands from its Representatives at all times:

1. <u>Honesty:</u> To be honest, truthful and forthright in all dealings with Company customers, suppliers, lessees, and competitors, the communities in which the Company conducts business, the Company, and fellow Representatives;

EXHIBIT K

2. <u>Integrity</u>: To demonstrate firm adherence to the Company's Code of Conduct in all business dealings and in the handling of suspected or actual ethical or legal violations, and to avoid conflicts of interest between work and personal affairs;

3. <u>Respect</u>: To treat all Company constituencies and fellow Representatives with dignity and fairness, and to foster an atmosphere that extends equal opportunity to all Representatives;

4. <u>Trust</u>: To build confidence through teamwork and open, honest communication;

5. <u>Responsibility</u>: To report actual or suspected legal and ethical violations without fear of retribution or retaliation; and

6. <u>Citizenship</u>: To obey all applicable federal, state and local laws and regulations, and to better the communities in which the Company conducts business.

In addition, the Company has adopted the following Diversity Mission Statement, which should guide the conduct of all Representatives:

Hilton Hotels Corporation is committed to developing and maintaining a workplace culture which reflects awareness and sensitivity to individual abilities, and appreciation of ethnic, gender, racial, religious and cultural differences. In doing so, the corporation will attract and retain a diverse workforce which will enhance its competitiveness in attracting customers, corporate partners, shareholders and owners. We believe that this culture will strengthen the business value of the corporation and affirm Hilton Hotels Corporation as an industry leader in the global market.

This Code of Conduct described in this policy is general in nature and does not specifically cover all of the laws, regulations and rules pertaining to business relationships. It is the Company's expectation that its Representatives understand, and will carry out, "THE RIGHT THING TO DO." Adherence to this Code of Conduct is part of the terms of a Representative's employment, and breaches may give rise to disciplinary action including possible termination of employment.

## STANDARDS OF CONDUCT

Set forth below are the Standards of Conduct to which all Representatives of the Company are expected to adhere, and their responsibilities for reporting suspected violations of these standards. These Standards of Conduct cover areas of business activity where breaches of ethical behavior or violations of law may occur.

### *SECTION I: ILLEGAL PRACTICES*

Company Representatives shall not, in discharging their assigned responsibilities and duties, engage in any activity which might involve this Company in a violation of any law, rule or regulation. It is the Representative's direct responsibility to become acquainted with all applicable legal standards and restrictions and to be guided accordingly. The services of the General Counsel are available through normal Company channels for advice and consultation in this respect. The General Counsel, on request, will furnish legal opinions regarding the legality or propriety of any particular policy or activity. In any case of doubt, the legal opinion of the General Counsel or local counsel must be obtained prior to action. Additional


EXHIBIT K

other entity, when the trip is for business purposes, such as seminars or conferences related to the Company's business or the Representative's responsibilities, and the Representative has supervisor approval.

When in doubt about accepting a business courtesy, contact your supervisor or the office of the General Counsel.

If it is not appropriate to accept or retain a courtesy, the Representative should either politely refuse the business courtesy at the time it is offered and explain why, or return an unacceptable gift with a letter to the donor explaining the Company's policy   (see suggested form attached as  Exhibit A to this Code). When it is necessary to write a letter, copies should be forwarded to the Representative's supervisor and the General Counsel for information purposes.

## B. TIPS AND GRATUITIES

Tips and gratuities in connection with job performance may be accepted from guests and customers by Representatives whose job function customarily involves such tips or gratuities, provided that no officer or any Representative having any control over the terms of doing business with the donor may accept any tip or gratuity, except as otherwise specifically permitted pursuant to Standard Practice Instructions

## C. BRIBES AND KICKBACKS

"Kickbacks," "bribes" or other similar remuneration or consideration intended to influence or reward decisions or actions are unacceptable and illegal. Representatives and their Immediate Family shall not solicit or accept, directly or indirectly, gifts, gratuities, "kickbacks," accommodations, loans, entertainment or any other payment or benefit from anyone which could improperly obligate or influence decisions. Strict adherence to the provisions of the Federal Anti-Kickback Enforcement Act of 1986, the Foreign Corrupt Practices Act and other commercial bribery laws is required of all Representatives.

No Representative shall offer or pay any bribe, kickback or other under the table payment of anything of value to anyone for the purpose of influencing or rewarding favorable action.

Practices or procedures that might conceal or facilitate bribery, kickbacks or any other illegal or improper payments or receipts, or that might support an inference of wrongdoing, seriously jeopardize important business relationships and subject the Company and its Representatives to legal procedures. Accordingly, all such practices are prohibited.

## D. GIFTS TO PUBLIC OFFICIALS

The federal government and most political jurisdictions have laws restricting what are defined generally as "gifts" to government representatives and which may include, among other things, any gratuity, discount, entertainment, hospitality, lodging, meals or other thing of value. The Company is committed to complying with these restrictions. No Representative shall offer or extend to any government official anything of value without having first contacted the General Counsel and the Vice President, Ethics and obtained written confirmation that any action being considered is proper and appropriate.

## E. CORRUPT PRACTICES

The Foreign Corrupt Practices Act ("FCPA") makes it illegal to bribe a foreign (non-U.S.)

EXHIBIT K

official, political party official or candidate for political office (collectively, "foreign official"). Specifically, it is a violation of the FCPA for a Representative (or an agent of a Representative or the Company) to corruptly offer, pay, promise to pay or authorize payment of money or of anything of value directly or indirectly to a foreign official in order to obtain, retain or direct business. "Corruptly" means the proposed offer, etc. is intended to induce the recipient to misuse his official position. Exceptions to the law are facilitating, promotional and lawful (under written local law) payments. Representatives must contact the General Counsel before making any payment to a foreign official. Strict accounting rules apply. There are criminal and civil sanctions against individuals and the Company for violations of the law. No Representative will engage in any act, or fail to take any action, that could possibly constitute a violation of the FCPA.

## F. BOYCOTTS

The Tax Reform Act of 1976 and the Export Administration Act of 1979 make it illegal to refuse to do business i) with or in a boycotted country;  ii) with any business concern organized under the laws of a boycotted country;  iii) with any national or resident of a boycotted country;  or iv) with any person who has dealt with a boycotted person or country (when the refusal is pursuant to an unsanctioned foreign boycott).

An example of an illegal boycott is the action by a boycotting country, e.g., Kuwait, making it a condition of a company's signing a contract with Kuwait that the U.S. company agree and certify that it will not do business in Israel (the boycotted country).  This is the Arab boycott of Israel.  Examples of other boycotts are Pakistan against India and The People's Republic of China against Taiwan.

The law applies to U.S. companies, their foreign subsidiaries and personnel of the foregoing.   No Representative will engage in any act, or fail to take any action, that could possibly constitute a violation of the boycott laws.

The laws require the reporting of both boycott-related requests (written or oral) and the action taken in response to such requests.  Representatives must promptly notify the General Counsel of any requests and must not comply with any such requests without the prior written approval of the General Counsel.  By complying with the law the Company will lose the business opportunity with the requestor and/or the principal.  There are criminal and civil sanctions against individuals and the Company for violations of the law.

Examples of boycott-related activities by or on behalf of a boycotting country are x) the Arab boycott cited above; y) requests for information with respect to the race, religion, sex, national origin or mother's maiden name of any U.S. person or entity or personnel of the entity; and z) requests for information with respect to any person's business relationships in a boycotted country or with companies, residents or nationals of the boycotted country.

## G. TRADE EMBARGOES

The Trading with the Enemy Act, the International Emergency Economic Powers Act and the Foreign Control Regulations impose broad financial and trade restrictions between the U.S. and certain countries.  The purchase or sale of goods or services from or to embargoed countries is illegal without a license (rarely issued).   The prohibition extends to direct and indirect (through third country) transactions. The laws apply to U.S. entities and their Representatives.

EXHIBIT K

of permissible and impermissible activities, and will seek guidance from his or her immediate supervisor, the Vice President, Ethics or the General Counsel, before engaging in or approving or condoning any questionable activity.

Every Representative shall familiarize himself or herself with the contents of this Code, and with all other related business policies and standards of conduct referenced in the document.

Representatives are expected and encouraged to consult with the Vice President, Ethics or the General Counsel with regard to any question they may have regarding this Code or what is or is not acceptable conduct.

Every department manager is responsible for ensuring compliance with this Code by Representatives within his or her section.

## D. TRAINING

The Vice President, Ethics, through the Human Resources Department and with the assistance of the General Counsel, will be responsible for providing ethics and compliance training programs for Representatives to facilitate their awareness and understanding of this Code. These training programs will cover the areas of business activity and practices described in this Code. The frequency and substance of the training programs will be tailored in accordance with the responsibilities of the various Representatives. Every department manager shall also be accountable for assuring appropriate training of the Representatives in his or her department.

## E. COMPLETION OF ANNUAL CERTIFICATION

All directors and officers of the Company, all general managers and managers of the Company's hotels, and all "key" employees as designated by the General Counsel, shall annually certify their understanding and compliance with this code and other matters covered by this document.

1. Vice President, Ethics and the General Counsel shall have the responsibility of assuring that all directors, officers and key employees complete teh certification as required. Refusal of any individual to complete a certification shall be reported to the President and the Audit Committee by the General Counsel.

## F. REMEDIAL ACTION

When any potential conflict of interest or any potential violation of the rules set forth herein arises, the Vice President, Ethics shall, at the direction of the General Counsel, follow the steps described in Section II.C of this Code.

## G. FAILURE TO REPORT

Employees who willfully fail to report Reportable Interests or Relationships or other transactions covered by this Code or who make a false report are subject to disciplinary action including possible termination of employment. Known or suspected violations of this Code must be immediately reported in accordance with the procedures set forth in the Section that follows.

## SECTION XVI: REPORTING AND DETECTING VIOLATIONS

EXHIBIT K

A. COMPANY POLICY CONCERNING REPORTING PROCEDURES

It is the Company's policy to: (a) encourage disclosure of actual or suspected violations of this Code and other improper or unlawful conduct; (b) encourage all Representatives to report actual or suspected violations of this Code and other improper or unlawful conduct; (c) protect Representatives who report such actual or suspected violations, or other improper or unlawful conduct, from retribution or retaliation for having done so; (d) take all reasonable steps to respond to all reports of actual or suspected violations, or other improper or unlawful conduct; and (e) assure consistent enforcement of this Code through discipline of Representatives who violate it.

B. REPRESENTATIVE REPORTING PROCEDURES

It is each Representative's responsibility to report all observed questionable activities, or departures from the ethical principles and standards of conduct expressed in this Code, to his or her immediate supervisor or, as described below, to the Vice President, Ethics or the General Counsel. There will be no retribution for alerting any of such persons to actual or suspected violations of this Code or other improper or unlawful conduct. It is the responsibility of each supervisor who receives information from his or her Representative with respect to an actual or suspected violation of this Code or other improper or unlawful conduct to promptly relay such information to the Vice President, Ethics.

To the extent that reporting to one's immediate supervisor would be inappropriate, or as an alternative to normal corporate reporting channels, Representatives are encouraged to report actual or suspected violations of this Code, or other improper or unlawful conduct, to the Vice President, Ethics or the General Counsel, either orally or in writing. Written communications to the Vice President, Ethics, which may, but need not be, made anonymously, should be mailed to the Vice President, Ethics, Hilton Hotels Corporation, 9336 Civic Center Drive, Beverly Hills, California 90210. All such communications will be kept confidential to the extent consistent with legal and ethical requirements. It is the policy of the Company to take reasonably practical steps to protect the identity or anonymity of any Representative who reports an actual or suspected violation of this Code, or other improper or unlawful conduct.

Pursuant to Section 301 of the Sarbanes-Oxley Act of 2002 (the "Act"), the Audit Committee of the Company's Board of Directors has established a toll free hotline (1-877-662-5825) to provide team members with a confidential and anonymous way to report any complaints regarding accounting, internal accounting controls or auditing matters.  Notwithstanding the availability of the toll free hotline, we encourage you to continue to utilize the Representative reporting procedures described above in this Section XVI.B to report any matters covered by Section 301 of the Act in the same manner used to report any other matters covered by the Code.

C. EVALUATION AND INVESTIGATION

The Vice President, Ethics shall evaluate all reports of actual or suspected violations of this Code, and other improper or unlawful conduct, and shall make a determination as to whether an investigation is warranted. The Vice President, Ethics shall consult with and receive advice from the General Counsel with respect to whether an investigation should be conducted and, if so, how.

When it is determined that an investigation is to be conducted, it is the responsibility of the General Counsel to: (a) request that an investigation be conducted and that the findings be

EXHIBIT K

reported to the General Counsel, and/or (b) where appropriate, retain outside assistance (with legal, technical, investigative, or other applicable expertise) to conduct the investigation and report back to the General Counsel. It is the responsibility of the General Counsel to communicate the results of any such investigation to the Vice President, Ethics.

## D. PROHIBITION AGAINST RETALIATION

No Representative of the Company shall retaliate, directly or indirectly, against a Representative for reporting in good faith an actual or suspected violation of this Code or any other improper or unlawful activity or for assisting in an investigation of a report no matter whom the report concerns.   Anyone who retaliates will be subject to disciplinary action, up to and including dismissal.

## E. ACTS OF WRONGDOING

The Vice President, Ethics, with the General Counsel, shall report to the Audit Committee any prosecutions or administrative actions taken against a Representative of the Company, and any criminal actions involving: (a) a felony, (b) a material crime against the Company, (c) embezzlement, larceny, bribery, or kickbacks, or (d) any other violation of local, state or federal criminal laws involving dishonesty or fraud.

The Vice President, Ethics shall, with the General Counsel, report to the Audit Committee material violations of this Code or acts of wrongdoing by any Representative of the Company or an Affiliate, if he or she believes such matter should be reviewed by the Audit Committee. The Vice President, Ethics, in consultation with the General Counsel, will prepare a report relating to any information coming to his or her attention that, in his or her opinion, warrants review by the Audit Committee concerning acts of wrongdoing.

## F. RECOMMENDATIONS REGARDING THIS CODE AND THE PLAN

The Vice President, Ethics shall review this Code and the Plan on a periodic basis and shall suggest proposed modifications or recommendations in light of: (a) the Company's implementation and enforcement of this Code and the Plan, and (b) changes in applicable federal, state, and local laws and regulations, and (c) changes in the Company's operations and lines of business.

## G. INTERNAL AUDIT FUNCTION

As part of its routine audit function, the Internal Audit Department shall review compliance by Representatives with the standards of conduct set forth in this Code. The Internal Audit Department may, as appropriate, request the assistance of the General Counsel. The results of these periodic reviews shall be reported to the General Counsel. The Vice President, Ethics, in conjunction with the General Counsel, shall evaluate the information received and take steps with regard to that information as outlined in Section XVI.E above.

## SECTION XVII: DISCIPLINE

Any violation of the applicable laws or standards of conduct expressed in this Code, or other improper and unlawful conduct, will subject a Representative to disciplinary action, which may include reprimand, demotion or dismissal, depending on the circumstances.

Disciplinary measures will also apply to any officer, manager or supervisor who directs, approves or condones violations, or has knowledge of such violations and does not move

EXHIBIT K

# Hilton Code of Conduct Reminders

## Expectations of All Hilton Team Members

- Uphold the highest standards of ethical conduct in every action you take on Hilton's behalf.
- Know the rules and laws that govern your work, and follow them.
- Ask questions and seek guidance when you are uncertain about the right course of action.
- Report issues or concerns when they arise.

## Business Courtesies

- **DO NOT** ask for business courtesies, ever.
- **DO** graciously accept tips or gratuities from guests and customers in connection with your job performance <u>only</u> if your job function customarily involves receipt of tips (such as valet, bell captain, restaurant worker, guest room attendant and housekeeper).
- **DO NOT** accept tips if you are in a job function with any control over the terms of doing business with the individual making the offer.

## Assets and Information

- **DO** protect confidential Hilton information and the privacy of our guests.
- **DO NOT** use Hilton resources or time to conduct outside work.
- **DO NOT** use Hilton computers or other electronic equipment to send, receive or access unlawful materials.
- **DO NOT** use any third party confidential information that you may have from a former employer or that you may receive purposefully or inadvertently.

## Bribery

- **DO NOT** bribe government officials or anyone else.
- **DO NOT** ask or authorize a business partner or anyone to bribe on Hilton's behalf.
- **DO** conduct due diligence on business partners before they interact with government officials on behalf of Hilton.
- **DO** notify Hilton Legal immediately if you have a concern about bribery or other improper payments.

## Conflicts of Interest

- **DO** avoid situations that could make someone question your judgment or objectivity on behalf of Hilton.
- **DO NOT** participate in a Hilton business decision that involves your family member or involves a company with which you or your family has a personal interest.
- **DO** disclose potential conflicts of interest immediately.

## Dealing with Team Members

- **DO** treat Team Members respectfully.
- **DO** immediately report and/or fix unsafe working conditions.
- **DO NOT** engage in discriminatory or harassing behavior in the workplace.

## Reporting Suspected Misconduct

- **DO** report concerns and suspected misconduct promptly.
- **DO** cooperate fully and honestly with Company investigations.
- **DO NOT** investigate concerns yourself. Instead, report them so that they can be investigated by trained personnel.

**SPEAK UP   The Hilton Hotline is available on line at www.hiltonhotline.com**

EXHIBIT K

Hilton Corporate

## Cash Handling Policies and Procedures

As a cashier at the Hotel you have been issued a bank for use in the performance of your job.  You are responsible for the proper handling of that bank and all cash transactions.  You will be responsible to read and sign a "Cash Handling Policy Statement".  The signed statements will be retained in your personnel file.

As a cashier, you are required to properly post all cash/credit card transactions and to be sure that your cash bank has the correct ending balance. In addition, your cash drop must balance to your end of day audit report.  Each day a variance report is prepared by management distributed to the General Manager, Rooms Division Manager and Food & Beverage Manager.  You are responsible for any discrepancy +/-$25.00 or more.  Excessive and/or repeated variances indicate that there is a misunderstanding of proper cash handling.  If you are having difficulty with daily cash transactions, it is your responsibility to contact your Supervisor for clarification.  Frequent variances (defined as three within a month) may result in disciplinary action.  The Hotel has established the following standards for disciplinary action related to cash handling:

> A. Verbal discussion and re-training in cash handling procedures for the first variance.
> B. Written warning and/or suspension for the second variance.
> C. Termination for the third variance
> D. Termination for any one (1) unexplained* cash, check and/or credit card discrepancy in excess of $100.00.
>
> *An unexplained cash discrepancy is defined as any variance which is not corrected within 48 hours of occurrence.
> *An unexplained check or credit card discrepancy is defined as any rejected check or credit card due to cashier negligence.

The following defines "excessive and/or repeated variances" subject to disciplinary action:

> Three (3) cash or credit card discrepancies +/-$25.00 or more during a period of thirty (30) consecutive calendar days.
> $50.00 of accumulated cash, check and/or credit card discrepancies during a period of thirty (30) consecutive calendar days.
> Accumulated cash, check and/or credit discrepancies in excess of $100.00 within a period of three (3) consecutive calendar months.

EXHIBIT K

Your responsibilities for your bank are listed below.  Note that your bank is subject to unannounced audits at the discretion of the Hotel Management and any variance in the bank count may result in disciplinary action.

> Your bank will always be kept at the dollar amount issued.
> Your bank money is to be used only for Hotel purposes.
> Your bank will be locked in your cash drawer while on duty.
> Your are the only person to work out of your bank.
> You are responsible to keep your bank stocked with change.
> Your bank will be secured in your assigned safety deposit box while not in use.

Variances detected during routine bank audits and lost/missing drop envelopes will be deemed extremely serious and disciplinary action instituted may include suspension and/or termination.

### Cash Handling Policy Statement Receipt

By my signature below, I acknowledge receipt of the Hotel Cash Handling Policy and Procedure.

I have had these policies and procedures explained to me and I understand the disciplinary action that will result should any of the policies or procedures relating to cash handling be violated.

I understand that the Hotel views any loss of company funds as a very serious matter.  Therefore, any loss of company funds on my part may constitute grounds for disciplinary action leading up to and/or including termination.

Signature: _____  Date _____

Print Name: _____

EXHIBIT K

Wages earned in the 1st Quarter of 2018, 1/4th of Annual earnings.

EXHIBIT L

```
CO      Empl ID      003596-003573
SVH     1297829
1738-Grand Wailea Hotel
Dept : 43000-Other Restaurant #4
Waldorf=Astoria Management LLC
Memphis Shared Services
755 Crossover Lane
Memphis, TN 38117
FEIN:261101088
808-875-1234
Taxable Marital Status: Marrie
Exemptions    Addl Amt  Addl %
Fed:    M-01
HI(W): M-01


Job Title : Server-Food
Pay Rate : $10.100000 Hourly
Total Hours Worked : 80.25
```

# Earnings Statement

| | |
|---|---|
| Period Beg/End: | Page 001 of 001 |
| Check Date: | 03/23/2018 -04/05/2018 |
| Check Number: | 04/12/2018 |
| Batch Number: | 0020129016 |
| Reference Number: | 000000001447 |
| | 000000275825 |

TUOMELA, WENDY
P.O. Box 1232
Kihei, HI 96753

| Earnings | Rate | Hours | This Period | Year-to-Date |
|---|---|---|---|---|
| Regular Wage | 10.1000 | 76.75 | 775.18 | 5634.12 |
| Overtime | 25.2114 | 3.50 | 88.24 | 974.04 |
| Charge Tip ( | | | 2077.39 | 10850.51 |
| Gratuities | | | 1614.70 | 12782.97 |
| Vac 11/2TRM | | | | 353.40 |
| Birthday | | | | 70.70 |
| Holiday | | | | 85.55 |
| Vacation for | | | | 46.25 |

| Other Benefits and Information | This Period | Year-to-Date |
|---|---|---|
| Before-Tax Deductions | | |

| Gross Pay | 80.25 | 4555.51 | 30797.55 |
|---|---|---|---|

| Taxes | This Period | Year-to-Date |
|---|---|---|
| Fed Withholdng | 557.02 | 3498.26 |
| Fed MED/EE | 35.93 | 289.22 |
| Fed Med/EE/tip | 30.12 | 157.34 |
| Fed OASDI/EE | 153.66 | 1236.72 |
| Fed OASDItipEE | 128.78 | 672.73 |
| HI Withholdng | 311.91 | 2049.20 |
| HI OASDI/EE | 0.00 | 0.00 |
| Total Taxes | 1217.42 | 7903.47 |

| After-Tax Deductions | | |
|---|---|---|
| ILW250% | 113.89 | 769.94 |
| Regular Dues - $ | 5.00 | 20.00 |

| Total After-Tax D | 118.89 | 789.94 |
|---|---|---|
| Total Net Pay | 3219.20 | 22104.14 |
| Fed Txble Wages | 4555.51 | 30797.55 |

| YTD Hours | Hours YTD |
|---|---|
| Regular Wages | 564.25 |
| Overtime | 36.00 |
| Vac 11/2TRM WAI ONLY | 24.00 |
| Birthday | 7.00 |
| Holiday | 9.25 |
| Vacation for Hawaii | 5.00 |

DDP Summary
Net Check                    3,219.20

| Total YTD Hours | 645.50 |
|---|---|

| Leave | USED | BALANCE |
|---|---|---|
| Vacation/PTO Tim | 16.00 | 136.00 |

EXHIBIT L

Cobra payments for family Health Benefits after termination on 4/17/2018.

EXHIBIT M



# ILWU LOCAL 142 HEALTH & WELFARE TRUST

1440 KAPIOLANI BLVD., SUITE 800 • HONOLULU, HAWAII 96814 • PHONE (808) 441-8650
FAX (808) 441-8750 • NEIGHBOR ISLANDS DIAL DIRECT 1 (888) 256-3573

December 28, 2018

WENDY K TUOMELA
PO BOX 1232
KIHEI, HI 96753

RE:   HAWAII LABORERS HEALTH & WELFARE TRUST FUND
      COBRA Plan Participant:        WENDY K TUOMELA

Dear Participant,

As requested, the following information includes your elected plan payment history while under the
ILWU Local 142 Health & Welfare Trust.  Please retain this document for your records.

| RATE: | Eff. 04/18 | $966.35 |
| | Eff. 04/18 REV | $964.20 |

Plan Type: Family
Coverage Period: 05/18-10/19

| | RECEIPT # | DATE RECEIVED | ELIG MONTH | PAYMENT # | AMOUNT |
|---|---|---|---|---|---|
| 1. | IH051805 | 05/07/18 | 05/18 | 2947 | $ 966.35 |
| 2. | IH051807 | 05/14/18 | 06/18 | 1978 | $ 966.35 |
| 3. | IH061805 | 06/01/18 | 07/18 | 2948 | $ 966.35 |
| 4. | IH071804 | 07/02/18 | 08/18 | 1999 | $ 966.35 |
| 5. | IH081803 | 08/07/18 | 09/18 | 2011 | $ 966.35 |
| 6. | IH091804 | 09/05/18 | 10/18 | 2020 | $ 966.35 |
| 7. | IH101804 | 10/04/18 | 11/18 | 2952 | $ 966.35 |
| 8. | REFUND | 10/22/18 | | ACCTG CK #3732 | $ (15.05) |
| 9. | IH111804 | 11/02/18 | 12/18 | 2038 | $ 964.20 |
| 10. | IH121802 | 12/06/18 | 01/19 | 2049 | $ 964.20 |
| | | | | **TOTAL PAID:** | **$ 8,677.80** |

If you have additional questions or concerns, please contact the Member Services Department at
(808) 441-8650 or toll free at 888-256-3573.

*964.20*

*$ 964.00*

Sincerely,

Member Services Department

cc:  File

*Paid 964.20*
*CPB V#2957 - Feb. 2019*
*Cobra Premium*

*EXHIBIT M*

Wages earned for the 1st, 2nd & 3rd Quarters of 2019, 3/4th of Annual earnings.

EXHIBIT N

# Earnings Statement

**ADP**

**Foodland** FOOD. FAMILY & FRIENDS.    **Sack N Save**    771-0001

3536 HARDING AVE. SUITE 100
HONOLULU, HI 96816
(808) 732 – 0791

| | |
|---|---|
| Period Beginning: | 09/09/2019 |
| Period Ending: | 09/22/2019 |
| Pay Date: | 09/27/2019 |

Taxable Marital Status:   Married
Exemptions/Allowances:
   Federal:     1
   HI:        1

WENDY K TUOMELA
P.O. BOX 1232
KIHEI HI 96753

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 14.3376 | 61.25 | 878.18 | 17,921.21 |
| Overtime | | | | 214.02 |
| Gift Card | | | | 100.00 |
| Giftcardgross | | | | 40.00 |
| Holiday | | | | 57.35 |
| Sick Pay | | | | 86.03 |
| Trn Cust Serv | | | | 27.84 |
| **Gross Pay** | | | **$878.18** | 18,644.81 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Tot Work Hours | 61.25 | |
| Vacation | | 29.00 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -15.23 | 241.01 |
| | Social Security Tax | -47.60 | 874.65 |
| | Medicare Tax | -11.13 | 204.55 |
| | HI State Income Tax | -27.99 | 499.36 |
| | HI SUI/SDI Tax | -3.95 | 79.18 |
| | **Other** | | |
| | Dental Pretax | -9.00* | 18.00 |
| | Medical Pretax | -101.57* | 4,519.61 |
| | Gift Award | | 100.00 |
| | **Net Pay** | **$661.71** | |
| | **Net Check** | **$661.71** | |

* **Excluded from federal taxable wages**
  Your federal taxable wages this period are $767.61

©1998, 2006, ADP, LLC  All Rights Reserved.

TEAR HERE

EXHIBIT N

EXHIBIT N

During a search of TUOMELA's locker, a bag of numerous receipts were found as well as a Visa debit card in the name of Adam Maginot that was found in TUOMELA's apron.  TUOMELA claimed to not know anything about the Visa debit card.

TUOMELA's actions were serious violations of the following policies and standards and shall not be tolerated:

- **Team Member Handbook – Guidelines for TM Conduct (which you signed and acknowledged receipt of on 2/3/16:**

2.  Has the team member received prior discussion or warning within the past 12 months?
☐Yes  ☒No   If "yes," describe below the date(s) and corrective action(s) issued.

Date & description of prior incident:

3.  Statement of corrective action taken:
(Include objective goals and dates for follow-up, if applicable)

4.  Team Member Comments:

I have read this corrective action report and have been given an opportunity to discuss it with my Supervisor Department Head.  I can make comments that I feel are appropriate to the documentation. My signature below indicates that I am in receipt of this notice.  I understand that any further infraction may result in disciplinary action, up to and including termination.

_____   _____        _____   _____
Team Member Signature                       Date             Supervisor Department Head               Date


_____   _____        _____   _____
Witness Interpreter                             Date             Human Resources                              Date




Grand Wailea Resort – 10.1.15

Exhibit O
+ Exhibit P

# OUR TEAM MEMBERS

Always behave in a manner that is consistent with Hilton's Values in your business interactions. As global leaders in the hospitality business, we understand the importance of treating all people well.

Team Members are expected to be aware of and abide by the Hilton standards and policies.

6

**CODE OF CONDUCT**

EXHIBIT Q

# DIVERSITY

We are a company of diverse cultures serving diverse guests. We seek to understand our unique global communities, and to create an environment of inclusiveness. We maintain our competitive position by applying our core Values; attracting the best and brightest talent; and valuing the diversity of our Team Members, guests, suppliers, partners and owners.

**Equal Employment Opportunity Policy**

# HARASSMENT-FREE WORKPLACE AND NON-DISCRIMINATION

Hilton does not tolerate any form of discrimination or harassment on the basis of race, religion, color, gender, age, national origin, sexual orientation, disability or any other characteristic protected by applicable law. Any behavior, communication, or other conduct that creates an environment that is intimidating, offensive or hostile based on any protected characteristic, or that otherwise interferes with any Team Member's ability to perform his or her job, is unacceptable.

**CLICK HERE FOR MORE INFORMATION**

## QUESTIONS AND ANSWERS

**What are some examples of prohibited harassment?**

Harassment can take many forms including:

- Written or verbal abuse or threats;
- Unwelcome remarks, jokes, slurs or taunting of a discriminatory nature;
- Practical jokes based on a protected classification that embarrass or insult someone;
- Ignoring, isolating or segregating a person because of a protected classification;
- Materials that are of a discriminatory nature that are displayed publicly or circulated in the workplace; or,
- Unwanted physical contact.

**Harassment and Violence-Free Workplace Policy**

# SAFE AND HEALTHY WORK ENVIRONMENT

Hilton is committed to the health and safety of our guests, Team Members and business colleagues. Safety requires a commitment from everyone. Hilton does not tolerate violent conduct or threats of violence among our Team Members. Hilton is committed to compliance with environmental, occupational and health laws. Each Team Member is responsible for understanding and complying with all applicable safety and health laws and guidelines. We are also each responsible for identifying and responding to health and safety hazards and security concerns. If you see a safety hazard, report it immediately.

**One of Hilton's core Values is Teamwork. We are team players in everything we do.**

CODE OF CONDUCT

EXHIBIT Q

CULTURE OF INTEGRITY

# CULTURE OF INTEGRITY

## NON-RETALIATION

At Hilton, we strive to create a culture in which Team Members can ask questions and raise concerns without fear of retaliation. Hilton prohibits retaliation against anyone for reporting a concern in good faith or assisting in an investigation. Subject to applicable law, retaliation is grounds for disciplinary action, up to and including dismissal.

## RESPECTING CONFIDENTIALITY

Hilton will take steps to protect the confidentiality of anyone who makes a good faith report of an actual or suspected violation, to the extent reasonably possible.

## INVESTIGATIONS OF REPORTS

At Hilton, we take reports of suspected misconduct seriously. We investigate reports as appropriate, and we maintain confidentiality to the extent possible, consistent with our need to conduct an investigation. It is important that Team Members promptly report information that a violation of our policies may have occurred. Investigations often involve complex issues, and time is of the essence in collecting, preserving and evaluating evidence. If you are asked to assist with an investigation, unless you are informed cooperation is voluntary, you are expected to cooperate with Hilton's investigators and answer questions fully and truthfully.

## VIOLATIONS OF THE CODE OF CONDUCT

Any violation of the laws or policies described in this Code, or other improper and unlawful conduct, may subject a Team Member to disciplinary action, up to and including termination and possibly legal action, subject to applicable law and depending on the circumstances. Subject to applicable law, disciplinary measures can also apply to any manager or supervisor who directs, approves or condones violations, or has knowledge of violations and does not promptly report and correct them.

## QUESTIONS AND ANSWERS

### What happens when I call the Hilton Hotline?

*When you call the Hilton Hotline, it is answered by a call specialist who works for the independent third party provider that operates the line. That person will listen, will likely ask you some questions, and will make a detailed summary of your call. The outside service will then forward the information to the Compliance Team, who will decide how to handle your report or question. Every effort will be made to give your call a quick response, especially when circumstances make that important. If an investigation is undertaken, Hilton will look into the issue promptly and, whenever called for, see that corrective action is taken.*

### If I report something that seems suspicious, but it turns out that nothing was wrong, will I get in trouble?

*No. Team Members are expected to raise good faith concerns that something illegal or unethical is occurring or has occurred. The only reports that are discouraged are those where the reporter intentionally reports something they know to be false.*

Each of us is responsible for putting this Code to work, but we do not have to do it alone. There are a number of people who can answer our questions and guide us through difficult decisions. When in doubt, ask!

### When faced with a decision-making dilemma, ask yourself the following questions. If you cannot answer "yes" to each and every one of them, do not take the action at issue.

- Is the action legal?
- Is it ethical?
- Is it socially responsible?
- Will this action appear to others to be appropriate? (Would your family be embarrassed if this action were to become known publicly? Would it look bad in the newspaper?)
- Does it comply with the spirit and letter of this Code and the Hilton Values?

If, after going through the above questions, you still have doubts about the best course of action, consult your supervisor, the Compliance Team, or the other resources discussed in this Code.

EXHIBIT R

CODE OF CONDUCT

EXHIBIT R



EXHIBIT R

# CULTURE OF INTEGRITY

## ADDITIONAL EXPECTATIONS OF HILTON LEADERS

In addition to the expectations that apply to all Team Members, Hilton leaders have additional responsibilities under this Code. Hilton leaders must:

- Demonstrate the highest standards of integrity – set the right example, and others will follow your lead.
- Create a culture of compliance and ensure that Team Members understand that business results are never more important than acting legally and ethically.
- Discuss ethics and compliance topics with Team Members and ensure that everyone on your team completes compliance training and other compliance requirements.
- Create an environment where Team Members are comfortable speaking up, and be available to receive reports of potential violations of the Code or applicable laws.
- Ensure that reports of suspected violations are brought to the attention of the Hilton Compliance Team immediately.
- Protect reporting Team Members from retaliation, and safeguard the confidentiality of investigations.

## SEEKING GUIDANCE

This Code describes a number of policies, laws and regulations applicable to Hilton Team Members around the world. Laws are often complex and their interpretation may depend on the particular facts and circumstances at issue. If you have questions about the Code or applicable laws or regulations, consult your direct supervisor, next level manager, Human Resources representative, or Hilton Legal. You should also consult Hilton Legal when developing new business lines, processes and initiatives in order to ensure that such initiatives comply with applicable law.

## SPEAKING UP

Team Members are expected to report suspected misconduct. Only by speaking up when we suspect potential violations of law or policy can Hilton address issues before they become bigger problems. *There are several places for you to raise compliance concerns:*

### In your workplace

You can report issues to your direct supervisor, next level manager, Human Resources representative, or any other Hilton leader. They will help ensure that your concern is routed to the Compliance Team for review and response. Team Members may also contact Hilton Legal or the Compliance Team directly.

### Reporting to the Hilton Hotline

The Hilton Hotline is available online at www.HiltonHotline.com. The Hotline is also accessible by telephone 24 hours a day, 7 days a week (refer to telephone numbers listed on the Hotline website and printed materials at your workplace). The Hotline is administered by an independent third party that collects information for transmission to the Compliance Team.

In the United States and many other countries, you may report your concern to the Hilton Hotline anonymously. However, some countries limit the types of issues that can be reported to the Hotline and whether reports can be made anonymously. Of course, Hilton respects the local laws that govern our Hotline. See the Hotline website and printed materials for additional information regarding how to use the Hilton Hotline in your location.

One of Hilton's core Values is **Ownership**. We are the owners of our actions and decisions.

*Grand Wailea*

A WALDORF ASTORIA RESORT

## CASH AND CHECK HANDLING RULES & REGULATIONS
## FOR ALL CASH HANDLING PERSONNEL

The following is a list of rules governing cash and check handling procedures. It is necessary that all cash handling employees understand and comply with these rules. Violation of any of these rules is unacceptable and may result in disciplinary action, up to and including termination.

## CASH POLICY

1. The house bank issued to you remains the property of the Grand Wailea Resort Hotel & Spa and is to be used solely for the hotel guest transactions.
2. For your protection, NEVER leave your bank unattended. Always make sure it is locked in your cash drawer or your vault. You are the only person with the key to your vault. If this key is lost, you must notify your manager immediately. You will be held responsible for the cost of drilling the vault and replacing the lock. A $25.00 payroll deduction will be made if the key is not recovered within 24 hours of loss. If you are working with your bank when the key is lost, the bank must be dropped to the General Cashier at the end of your shift OR request the use of a guest vault at the Front Desk. Until a replacement vault is issued, or other arrangements for a working bank will be made.
3. All house banks must be turned in prior to any vacation or leave of absence of five (5) days or more, or assignment to a non-cashiering position. The entire bank and safe deposit box key must be returned to the General Cashier. Banks may be returned by dropping the bank amount and safe deposit key in case of a true emergency.
4. Never let supervisors, other employees, or any other individual have access to your bank or work out of your bank. All transactions MUST be completed by the individual that was issued the bank.
5. If you relieve another employee for a break, you must always use your own bank and your own Micros identification number.
6. Always maintain the exact amount of your bank as issued. This includes the amounts of any due-backs. **Short your deposit if necessary, to keep your bank at the issued amount.** All overages must be deposited at the end of your shift.
7. Checks (travelers, company, or personal) should be part of your daily deposit and NOT held as part of your bank, even if this creates a dueback. Exchange them with the General Cashier prior to the end of your shift. Other items, such as paid outs, petty cash vouchers and IOU's are not permitted in your bank and must be dropped at the end of your shift.
8. Employee's personal checks may be accepted ONLY for goods and/or services, using the proper check acceptance procedures. **At NO time are they to be accepted in return of cash.**
9. Before making a deposit, your DROP ENVELOPE must be correctly filled out. (See Closing Procedures)
10. Before making a deposit of DUEBACK is dropped in the safe the Drop Box Log must be correctly filled out. (See Closing Procedures). ALL DEPOSITS OR DUEBACKS MUST HAVE A WITNESS.
11. After placing envelope in the slot on the drop safe and turning the drum, ALWAYS double check to be sure envelope has dropped into the safe.

Cash Handling Contract and Policy Effective October 17, 2016

EXHIBIT S

# You Have Rights!

### *Problems on the job?  See the Union!*

As a member of a Union, you have rights on the job. With the ILWU, you have the combined strength and experience of the Union on your side.

You have the right to have a Union Steward or Business Agent help you with any problem on the job. You have the right to ask for a Union Representative if the company calls you into a meeting which may lead to disciplinary action.

You put yourself at a disadvantage when you try to settle a problem by yourself, or when you fail to let your Union know of problems you and your fellow workers have.

When you try to settle problems yourself, your supervisor may agree and then change his mind the next day. Or you may agree to something that may hurt your fellow workers.

The best way is the Union way, where you have the combined strength of other workers beside you.

If you have a problem on the job, the first



thing you should do is talk to your Union Steward or Representative.

The Union contract spells out a step-by-step process called the Grievance Procedure. It is a method of handling job related problems. The grievance procedure has time limits, so you should contact the Union as soon as possible.

Some of the steps are:

**First step**—A meeting is held with you, your Union Representative, and your immediate supervisor.

**Second step**—If the problem is not solved to your satisfaction, you can have the Union meet with the general manager or personnel director.

**Third step**—The Union may take your problem to arbitration. ILWU attorneys will be brought in if needed.

*"An Injury to One Is an Injury to All!"*



EXHIBIT T

# If you have a problem...

## *Company house rules and company discipline*

The company may have House Rules, Standards of Conduct, Dress Codes and work policies that are separate from the union contract. These are the company's rules; however, the union may get involved if you are disciplined as a result of any of these rules or if these rules are unfairly applied, are unreasonable, or unrelated to the business objectives of the company.

If you are given an oral or written warning or are disciplined by management, you should contact your union representative immediately. You have a right to ask for a union representative, if you are called into a meeting with management and you believe the meeting may result in disciplinary action.

The company may not discipline or discharge any employee, except for just and proper cause. Just and proper cause involves the following principles:

1. The company must give the employee **forewarning or foreknowledge of the possible or probable disciplinary action** as a result of the employee's conduct.

2. The company's **rule must be reasonably related** to the orderly efficient and safe operation of the employer's business, and the performance that the company might properly expect of the employee.

3. Before administering discipline to an employee, the company must make an **effort to discover** whether the employee did in fact violate or disobey a rule or order of management.

4. The company's investigation must be conducted **fairly and objectively**.

5. When the company conducts its investigation, it **must obtain substantial evidence or proof** that the employee was guilty as charged.

6. The company must apply its rules, orders and penalties **evenhandedly and without discrimination** to all employees.

7. In determining the degree of discipline the company must show that the **penalty is reasonably related to the seriousness** of the employee's proven offense and shall consider the employee's record of service and length of employment with the company.

The union will work on your behalf to investigate if the company acted properly in taking disciplinary action against you. If you are disciplined, there is a time limit in which to contact the union and have the union file a grievance. Because of this time limit, do not delay. Contact a union representative as soon as you can.



EXHIBIT T

On April 16th, 2018, Stephen West I.L.W.U. Business Agent failed in his duty to defend Ms. Tuomela. She was verbally threatened by Michael Palazzotto, security guard at the Grand Wailea Hotel. Mr. West also failed to perform his due diligence to grieve her case. Mr. West did not help in any way to prove the fact that she was innocent. Mr. West collaborated with the agents of the Grand Wailea to take away her position and remove her from her 20 years of service by siding with the Hotel in collusion to wrongfully terminate Ms. Tuomela from her position. Mr. West now is employed at the same hotel in a position similar to the one that Ms. Tuomela vacated upon her termination. Mr. West did not follow protocol as laid out by the Union itself.

1. The company must give the employee forewarning or foreknowledge of the possible or probable disciplinary action as a result of the employee's conduct. (Prior to Ms. Tuomela's termination she had zero write-ups, zero reprimands.)
2. The company's rule must be reasonably related to the orderly efficient and safe operation of the employer's business, and the performance that the company might properly expect of the employee. (Ms. Tuomela was never trained as a cashier nor issued a hotel bank, yet her daily books always balanced to the penny. She always performed her duties with pride and respect for the hotel and the hotel guests.)
3. Before administering discipline to an employee, the company must make an effort to discover whether the employee did in fact violate or disobey a rule or order of management. (Ms. Tuomela never disobeyed any rules or orders of the hotel management she was always accurate in her service and followed the company rules.)
4. The company's investigation must be conducted fairly and objectively (The poorly conducted investigation would have found Ms. Tuomela innocent of all charges. In a rush to judgment and to terminate, she was never given a chance to prove her innocence.)
5. When the company conducts its investigation it must obtain substantial evidence or proof that the employee was guilty as charged. (There were only false accusations, threats of incarceration using the MPD and extortion of cash that was later found was not owed. Ms. Tuomela was innocent of all charges, innocent unless proven guilty?)
6. The company must apply its rules, orders and penalties evenhandedly and without discrimination to all employees. (The discrimination is that she is over 40, these agents were trying to get rid of older employees in order to bring in new blood.)
7. In determining the degree of discipline the company must show that the penalty is reasonably related to the seriousness of the employee's proven offense and shall consider the employee's record of service and length of employment with the company. (Ms. Tuomela's service for 20 years was spotless and was never brought into consideration.)

Fiduciary Duty should not be taken lightly. Obviously Mr. West was interested in securing his own position in this Hotel. Mr. West's fiduciary duty to represent Ms. Tuomela for the Union and to follow the Union Protocol became secondary. Ms. Tuomela was not guilty of Identity theft or misconduct in any way, further investigation by the Hotel agents found that she was innocent of all charges. All of the charges against her remain on her public record and nothing has been done to rectify this situation to date. Ms. Tuomela suffered damages to her reputation as well as to her

EXHIBIT T

financial well-being.  This is all due to the lack of proper representation by her Union.  Ms. Tuomela is a vested member of the I.L.W.U. Union Local 142. It is the absolute responsibility of this Union to represent and legally uphold the rights of its members.  Ms. Tuomela is a member and has been a dues paying member for 20 years, her union should be held accountable for her damages.


Further the Union did not uphold its own protocol.

**First Step:**  A meeting is held with you, your union representative, and your immediate supervisor.  (Ms. Tuomela was NEVER allowed to speak with any of her supervisors.  The two people who fired her didn't ever know her nor did she know them.)

**Second Step:** If the problem is not solved to your satisfaction, you can have the Union meet with the General Manager.  (Ms. Tuomela would have loved to have been offered this option, but it was never offered.)

**Third Step:** The Union may take your problem to arbitration.  ILWU attorneys will be brought in if needed.  (Ms. Tuomela was never offered any legal help at all. She was denied all legal representation.)

EXHIBIT T

IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

STATE OF HAWAII

Wendy Tuomela

           Plaintiff                      CIVIL NO._____

     Vs.

Waldorf-Astoria Management, LLC

% CSC Services of Hawaii, Inc.

     Does 1-78

          Defendants

## SUMMONS

To the Defendants:  You are hereby summoned and required to file with the court and serve upon the Plaintiff Wendy Tuomela, an answer to this complaint which is attached.  This action must be taken within (20) twenty days after service of this Summons upon you, exclusive of the day of service.  If you fail to make your answer within the twenty day time limit, specified above, judgement by default will be taken against you for the relief demanded in this complaint.

Pursuant to rule 4(b) of the Hawaii Rules of Civil Procedure, this Summons shall not be delivered between 10:00 p.m. and  6:00 a.m. on premises not open to the public, unless a judge of the above entitled court permits, in writing on this Summons, personal delivery during those hours.  A failure to obey this Summons may result in an entry of default and a default judgement against the disobeying person or party.

          Dated: Wailuku, Maui, Hawaii. _____ FEB 2 7 2020 _____

                            /sgd/ V. ISHIHARA (seal)

                                Clerk of the Above-Entitled Court